Case number 25-5133. Vertex Pharmaceuticals Incorporated Appellant v. United States Department of Health and Human Services et al. Mr. Hallward-Drehmeier for the appellant. Mr. Winnick for the appellees. Good morning. Good morning. May it please the Court. Doug Hallward-Drehmeier on behalf of Appellant Vertex. I'd like to reserve two minutes of my time for rebuttal. The District Court recognized that the purpose of the AKS is to prevent the providing or purchasing of health care services that are medically inappropriate in exchange for financial rewards. The government doesn't disagree with that. It actually quoted the same language in its brief. And in another case, in the First Circuit, the same government counsel was even more candid. It said that the point of the AKS is that financial conflicts in and of themselves corrupt medical decision making. If this Court agrees with those characterizations of the AKS, then it has to set aside the OIG's advisory opinion here. Because OIG rejected the notion that the AKS requires anything inappropriate or corrupting, mere influence over medical decision making is a crime under the analysis OIG applied. OIG's construction cannot be squared with the text of the AKS. And that's where I want to start. The AKS starts in paragraph B-1 by criminalizing the solicitation or acceptance of remuneration, including any kickback, bribe, or rebate, in return for providing, purchasing, or referring medically, federally reimbursed health care. Paragraph B-2, which is the provision of issue here, is the flip side of the same coin. Congress criminalized offering or paying, quote, remuneration, including any kickback, bribe, or rebate, to induce such a referral or purchase. In other words, soliciting an unlawful referral or purchase in violation of B-1. B-2 and B-1 operate as a complete whole. And Congress's use of the trio of examples, kickback, bribe, or rebate, in both provisions, and its phrase remuneration to induce, which is the obverse of in return for in B-1, confirmed that AKS's two prohibitions operate together to prohibit both sides of a corrupt transaction that distorts medical decision making from the medical merits. Can I ask a hypothetical that's been on my mind? So if Vertex just, let's assume that the cost of the gene therapy is a million dollars, and let's assume that the cost of fertility treatment is $70,000. If Vertex had just reduced the cost of the gene therapy by $70,000, it means that the government, through Medicare, Medicare, Medicare, Medicaid, would pay $70,000 less. So that would be a win for the government. It wouldn't necessarily be a win for the patient, though, because the government doesn't cover fertility treatments, so that would be $70,000 out of pocket for the patient. And the patient's not actually getting a personal out-of-pocket discount on the gene therapy because the patient's not paying for that. The government's paying for that. So that might have been okay to do, but it wouldn't have helped the patient's pocketbook. So I think what Vertex did is they said, well, we'll charge a million for the gene therapy and we'll give you $70,000 cash for the fertility treatment. The problem is that the government has made a choice that it doesn't want to fund fertility treatments. So what you've, in effect, done is gotten the government's million dollars for the gene therapy and then taken $70,000 of that, paid for the fertility treatment. In other words, you have arranged the system so that the government will pay for the fertility treatment instead of the patient paying for it out of pocket. Because even though you're the one that's giving the $70,000, you're getting that $70,000 from the million that you get from the government. So this seems like almost exactly what the anti-kickback statute is designed to prevent. You're making the government pay for stuff the government doesn't want to pay for. No, Your Honor, because the government will pay its share of the million dollars whether the patient gets fertility services or not. The government has agreed through the terms of the Medicare and Medicaid programs what share it's going to provide. And that's true, again, here, whether or not a patient gets fertility services. Vertex is offering that from the money that it would otherwise have in order to assist patients to have access to this life-changing cure. And I think what, again, what OIG did in analyzing this was to assume that any influence on decision-making was enough to violate the statute. If what Your Honor's question implies is that there is something improper about Vertex's influence, some wrongful influence, that is the standard that the Ninth Circuit applied in Shana, the Fifth Circuit applied in Marchetti, the Seventh Circuit applied in Swanson. But it's not the standard that OIG applied here. OIG rejected the notion that there had to be anything improper. They thought any kind of influence would be enough. And that's why OIG's construction captures merely engaging in a contract with an advertising agency, which is, of course, paid remuneration to recommend the purchase of a product. And that's the situation that's been addressed in Marchetti and Swanson and Shana. And those courts recognized that it can't merely be influence. It has to be in some fashion wrongful influence in order to violate the statute. But that's not the standard that OIG applied here. Of course, we're on APA review. And so the proper reason for this is- And maybe I'll get the numbers wrong, we'll see. But take two patients. One gets fertility treatment, one doesn't. They both get the gene therapy. The government pays a million dollars for each gene therapy. And under your program, both patients pay nothing beyond that. The first patient pays nothing for the fertility treatment because he doesn't get the fertility treatment. The second patient pays nothing for the fertility treatment because Vertex is paying the $70,000 for the fertility treatment. So the government in the first case is paying a million dollars for a patient who's getting just the gene therapy. But the government in the second case is still paying a million dollars for a patient who's getting the gene therapy plus the fertility treatment. So the government is in effect, for that second patient, paying for the fertility treatment. No, they're getting more without having to pay for it. Vertex is providing the fertility care. And I think that the CMS- Couldn't Vertex just knock $70,000 off the cost of its gene therapy? No, because your initial question is exactly right. This is not something that Vertex can address by lowering the price because that doesn't address the access to care problem. I'm not saying they could knock off $70,000 for all patients, but they could knock off $70,000 for the patients who need fertility treatment. And then the government would only be paying $930,000 for that patient. Patients would still not get fertility treatment. The system doesn't allow it in a sense because the government- They could still get the fertility treatment. You could pay them $70,000 in that situation, and they would get free fertility treatment. The problem with that for you is you'd be paying them $70,000 out of the $930,000 that you get from the government, and you want to pay them $70,000 from the million you get from the government. Your Honor, none of this is part of the OIG analysis because OIG doesn't require that there be anything wrongful, anything about making the service more expensive to the government. Here, Vertex's product is $1 million less than the competitor product that was on the market. That was reflected in OIG's opinion. This is not about causing the government to spend more for Vertex's product. If anything- It would be $1 million and $70,000 less than the competitor's product. Vertex weren't kicking in the $70,000 to pay for the fertility treatment for the patients who wanted fertility treatment. Even that program that Your Honor hypothesizes would violate the criminal statute under OIG's standard because OIG's standard is anything of value that could merely influence decision-making, including in order to promote access to care. Eliminating a barrier to care is an influence that OIG says violates this criminal statute. That is not consistent with what the Supreme Court said in Hansen when it construed induced, not as mere influence. It explicitly rejected the notion that induced in a criminal statute means mere influence. It has to mean criminal solicitation. Here, the statute doesn't directly prohibit inducement. It talks about paying remuneration that essentially causes a person to use more federally paid-for healthcare or services. It doesn't say causes. It doesn't say causes, it's true. It uses that trio of examples, kickback, bribe, or rebate, to indicate that induced does here carry its traditional common law meaning. I find your interpretation intuitively very appealing. Right? That this is a criminal statute and so induced needs to have some kind of wrongdoing aspect connected to it. I understand that argument. But then this statute is written so broadly in a way that suggests that basically any remuneration, including rebates, there's nothing insidious about a rebate, that induces a person, you know, to, right, to- Your Honor, rebate in this instance has a particular meaning because that trio of words, kickback, bribe, or rebate, come from the predecessor to the AKS. Before the AKS was amended in 1977, its predecessor statute in 1972 prohibited the offer, solicitation, or receipt of, one, a kickback or bribe in connection with the federally funded care, or a rebate of a fee or charge for referring a patient. So that phrase, rebate of the charge or fee for referring, is a form of kickback. It's not just to the person who otherwise paid. It's to the third party who referred. So it's that same corrupt- Right. But Congress has continued to broaden the statute. And I don't understand Vertex to be making any non-delegation argument, which- We're not, Your Honor. We're arguing that, but it didn't broaden it as much as it did in the civil statute. In the civil statute, Congress did use the word influence, likely to influence, but it omitted that trio of corrupt examples, kickback, bribe, or rebate, and it added other limitations. For example, the civil statute does not apply to the recipient, to the beneficiary, the patient. The civil statute does not apply to remuneration offered to promote access to care. The civil statute only applies when it is likely to influence the choice of a particular provider. All of those limitations are necessary precisely because Congress used this broader word to influence. In the criminal statute, it used a traditional criminal word induced that has a longstanding meaning of criminal solicitation. And in B-2, the criminal solicitation is the violation of B-1, which is that corrupt transaction that the government itself has characterized in other briefs. Corruption is at the heart of the AKS. But OIG reads it out, and that's why an advertising agreement would be violative under OIG's standard. It's why a generous aunt giving her niece money to be able to overcome the financial barrier to getting the care she needs would be a crime. The government cannot defend the incredible breadth and really the absurd breadth of its reading. Most importantly, it can't explain why the criminal statute would criminalize precisely that conduct that Congress carved out even from civil liability in the access to care exception to the civil statute. You need that exception to the civil statute precisely because the civil statute uses the broader influence. But if the criminal statute only prohibits inducement, the solicitation of a crime, the solicitation of someone who's going to purchase the service in return for the money. A patient here is not purchasing CASGEVI in return for fertility services. Fertility services merely address an unfortunate side effect of the conditioning necessary for CASGEVI. CASGEVI saves lives, Your Honor. Patients are not buying it. It's not medically inappropriate. And under all of the limitations of Virtex's program, it's designed entirely to make sure that the patient has been diagnosed with sickle cell or TDT, that the patient has already been determined to be appropriate for this product. It's not being advertised to the patient or anybody else. All of these are designed to ensure that the medical decision-making is not being corrupted. If the government thought, if OIG thought that there was some problem with Virtex's proposal, that there was something else that Virtex should do in order to make sure that it was not corrupting the decision-making, it could have asked Virtex about that. But it never got to that because under OIG's reading categorically, anything that influences decision-making or in the case of advertising, anything that induces one to recommend the program. Let me ask you a question. So if this court were to conclude that you succeed on your arbitrary and capricious challenge, right, to whether there was insufficient data to determine whether the program fits under the promotes access to care exemption. So if Virtex were to prevail on that, that doesn't really give you the relief you want under the kickback statute. I mean, is there any carryover effect? Well, Your Honor, I think that it's exemplary of why the reading of the kickback statute goes overbroad. Because again, as I said, under the government's reading, something that would satisfy the access to care provision. As CMS has determined, this is essential to overcome barriers to accessing this life-changing treatment. That would nonetheless be criminal. You couldn't do what the exemption under the civil statute, the CMPL, really invites providers to do, offer remuneration to overcome barriers to care, because you would still be committing the crime. Do you think that HHS would have to revise its opinion about the criminal statute if it revised its opinion on the civil statute and whether Virtex fit within the exemption? Well, Your Honor, I think that it would at the very least have to redo that analysis. I think that our argument that their construction of the AKS is one that would effectively prohibit companies from doing exactly what Congress encourages them to do in the exception to the civil statute, at the very least, I think OIG would have to redo that analysis. And I think that they would also have to redo their analysis in light of the three decisions in the last two years, from the Ninth Circuit, the Seventh Circuit, and the Fifth Circuit, all of which say that induced in this statute means wrongful influence, not mere influence. Can I also ask you a question about your standing on the timing regulations? So you're challenging the timing regulations. And now they've issued the opinion, so the timing, the challenge to the timing regulations isn't live in this case. But I don't see Virtex to make a capable of repetition yet evading argument. It's not in so many terms, Your Honor. But in order for the issuance of the opinion to moot our argument, this court's cases suggest that we have to have somehow said, this is a one and done for us. The opposite is true on the evidence here. Virtex has submitted multiple requests for advisory opinion. Virtex has indicated that as an innovator in this field, it will seek other advisory opinions. This is what Virtex does, change patients' lives. But it can't do that if every time it tries to assist patients to access their life-saving care, OIG is going to say, this is a crime. In fact, OIG's analysis here makes it even more likely that Virtex will have to seek advisory opinions. Because under OIG's construction, everything that a pharmaceutical company does is a potential violation of the ACA. And so you have to go to OIG, hat in hand, asking for its blessing to do something. That is not how criminal law works. If I may interrupt you, there's a hidden problem here with the issue as posed. And it's one that has bothered me for quite some time. And it depends on how you frame up the question, whether you frame it as standing or whether you frame it as mootness. If you frame it as standing, you've got a problem because the injury has to be imminent. And it doesn't seem to me that you've really established any imminent injury, maybe something in the future. But if you frame it up as a mootness question that is capable of repetition but evading review, there's no time limit on that. And it could be capable of repetition in the next five years, for that matter. And there's Supreme Court cases indicating that. So there's a conflict in Supreme Court jurisprudence here. And I'm not really sure how intellectually you decide which is the proper framework, mootness or standing. Your Honor, I think that the same analysis should apply to both of those elements of justiciability. Because what we have here in the case of OIG is a statute in which Congress has explicitly mandated that OIG's regulations shall provide that the advisory opinion shall issue within 60 days of receipt of the request. But OIG routinely delays, as it did here, a year. In the Pfizer case, as in this case, the opinion did not issue until after the requesting party waited a year for a decision and then, unable to wait any longer, sued OIG. And only then did OIG issue its advisory opinion. This is a problem that is going to repeat over and over and over again. Because every time OIG is sued, once the party has finally reached the breaking point, OIG will simply issue its opinion. Over and over again, it waits a year to issue its opinions because it does not regard the 60-day statutory deadline that Congress imposed as somehow binding on it. It is that disregard for the law. It's that view of OIG that it is the one that dispenses justice. It will decide when one can or cannot offer assistance to patients. That is not how criminal law works in this country. The Supreme Court has made clear in Skilling and McDonald, in any number of cases, that we do not depend on the grace of government. Criminal statutes are construed narrowly precisely so that parties can go forward in their normal operations without worry. And you don't have to go to the government to ask forgiveness. Can I ask you, have there been successful prosecutions of pharmaceutical companies for this type of non-corrupt rebate? Yes, yes. I'm just wondering if they have been prosecuting companies for a similar type of scheme. So you use the word prosecute, but I think it's really important to underscore here that the violation of the anti-kickback statute is a per se basis for a liability under the False Claims Act. And so relators repeatedly bring False Claims Act cases on the basis of a purported violation of the anti-kickback statute. They prefer that theory because it relieves them of any need to prove individual causation, or so they think. And so they rely on the anti-kickback statute. And the government has collected billions of dollars on the basis of purported AKS violations, including patient support programs. And those are usually brought by private relators. And then the government comes in to support. Because the First Circuit case that I mentioned earlier in which the government said, of course an AKS violation is a basis for treble damages under the False Claims Act. They said because an AKS violation means that there's been a financial conflict that inherently corrupted medical decision making. That's what a brief written by Mr. Winnick in the First Circuit argued in order to establish treble damages under the False Claims Act on the basis of an AKS violation. That notion of inherent corruption, however, is absolutely missing from what the government thinks actually violates the AKS. And we think it's that interplay of the AKS, both with the civil monetary penalty statute, but also the False Claims Act. It makes sense that if it is a truly corrupt transaction that gives rise to AKS liability, that an AKS violation should give rise to treble damages because the claim would be false. But on the government's theory, the claim does not have to have impacted actual decision, medical decision making. It doesn't have to be inappropriate medical care in any way for there to be an AKS violation. And that's exactly the problem, Your Honor. Do you know when the next advisory opinion request will be? From Vertex, Your Honor? I would think that it would be in connection with one or another of the new programs, new products that Vertex has that are expecting FDA approval. Vertex has a number of products in development. And when it comes on, they will then see what are the obstacles to patients being able to obtain this care. In the case of Kes Jebe, there were two obstacles. One is the one we've been talking about today, which was infertility and the need for fertility preservation services. The other was that Kes Jebe can only be provided at particular treatment centers because it's a very, very specialized treatment. And so patients will often be unable to accept that because they can't get to the necessary hospital centers. And so Vertex also sought an OIG advisory opinion that merely offering transportation support to patients would not violate the AKS. Of course, OIG opined in that instance that as with everything, it would implicate the AKS because it would be remuneration that was likely to influence patients' decisions to access the care. So it's a crime. Offering transportation to the hospital is a crime. But in that instance, OIG exercised its grace and said they would forgive the crime. But that, as I said before, is not how criminal statutes are supposed to work in this country. We don't go hand in hand. I take that point. On the delay issue, I suppose this wouldn't matter for standing or mootness, but if you do get to the merits, it seems like the delays happen when OIG asks for more information. I suppose within the 60 days, OIG could just deny the, you know, write a letter saying we deny it because we don't have enough information instead of giving you the opportunity to provide more information before they deny it. I think that's quite possible. But note here, Your Honor. How would you be better off in that regime? Well, note here, Your Honor, that the lengthiest part of the delay here was from February when OIG had already provided its oral determination that it was going to find that this implicates the AKS. And Vertex said, please write that up so that we can seek judicial review. That was in early February. OIG did not issue this opinion until July after Vertex had already sued. In and of itself, that's more than 60 days. Now, how does OIG justify that delay? Because they say, well, we're consulting experts. That's another tolling provision that it has given itself, even though Congress did not give it. In fact, Congress contemplated in the statute that OIG would be consulting with the Attorney General, and yet in the same statute said that they have to issue their advisory opinions within 60 days. That's a strong point. If we were to vacate based on the letter being unreasonably explained, what relief would you be seeking with regard to the delay issue? I think with regard to the delay, the relief would be to declare that the regulation is inconsistent with law to the extent that it claims for OIG unilateral authority to toll the 60-day period that Congress has set for it. And your representation is that Vertex has new drugs that are in the FDA pipeline for which you would consider similar types of remuneration. And so that brings it within the... Yes, Your Honor. That makes it an injury in fact. Yes, Your Honor. One last question to just go back to the merits. The government makes a lot of surplusage arguments. Under your interpretation of the statute... Sorry, let me correct that. Under the government's interpretation of the statute, would it create any superfluidity? Yes, Your Honor. I think it creates two different forms of superfluity. One, I think that the parenthetical, the exemplary parenthetical of kickback bribe or rebate becomes superfluous. We think that that's informative of what is meant by remuneration to induce or remuneration in return for. That quid pro quo. The government's construction also creates what I think is superfluity in the exception to civil liability because no one would ever undertake the very thing Congress has encouraged companies to do, promoting access to care, under the civil exception, if they are nonetheless going to be criminals. As we say in our brief, Congress should not be understood to have made felons of the people who are doing exactly what Congress asked them to do in the exception to the civil statute. And I don't think that the exceptions to the AKS are superfluous because we can all imagine, for example, the government uses the example of the exception for employment agreements. And we can all imagine situations in which an employee is recommending for purchase a product of his employer because he is receiving a salary from that person. That is his job to do. Even if he took his employee hat off, he might think that the best medically appropriate product would be another one. I saw that in the briefing. I think, again, they have some strong points. I'm not totally persuaded by the parenthetical point you made about surplusage because the government's reading would make the words following including surplusage, which words are always surplusage when they follow the word including. Your reading would make the words following excluding surplusage. And usually words that follow excluding are not at all surplusage. It's quite important. Your Honor, we gave in the brief the example of the mission products or technology case from the Supreme Court. And I happened to argue that case, so I am very well familiar with it. And I was arguing the opposite. I was arguing that all of these exceptions that only make sense if one presumes that a bankruptcy being a deemed breach does not make the contract disappear. Because all of the exceptions were about how the counterparty to leases and other contracts would, in particular circumstances, retain their rights under those leases or contracts. And we said those would all be surplusage if a breach was not deemed to basically terminate the contract otherwise, but instead only provide the plaintiff with a cause of action for damages. And Justice Kagan, in her opinion, said, yeah, maybe. But, you know, these exceptions were all adopted over a long period of time just to make sure, for Congress to make sure that these things would not be a problem. That's the same thing here. These were not a long list of exceptions all adopted at the same time. They were adopted I think at like nine different times over a period of I think it's something like 20 or 30 years. And there is not a coherent theme to them. And I think that the employee example is the perfect one. Of course there can be employees who are making recommendations or referrals solely because they are receiving a paycheck that is corrupting, arguably, and would otherwise violate the AKS. But it's not surplusage because Congress wanted to make clear that just categorically those are off the books, right? Now, with respect to an advertising agency or other intermediary, that could violate the statute because we don't have an exception. And so the courts, when confronted with those examples, have said that it has to be somehow wrongful influence because, of course, you're hiring an advertising agency to influence referrals or recommendations, right? So and the generous ant is another example. Of course the generous ant isn't committing a crime. And the government's only answer to that is, well, the generous ant doesn't want a particular product. Well, the word particular is not in the AKS. It is a limitation on the civil statute because the civil statute uses influence. But, moreover, even if the generous ant did only offer the assistance if the patient of the niece was going to choose a particular product, that still shouldn't be a crime. And the government's only other answer is to say, well, they wouldn't have acted willfully. But if the generous ant is a lawyer, a judge, a doctor, anybody in the health care life sciences industry that knows about the AKS, they would be acting willfully. Thank you. Let me see if my colleagues have any other questions. Judge Randolph. No, I'm fine. Judge Walker. Okay. Thank you. We'll hear from the government. Good morning, Your Honor. May it please the court, Daniel Winnick for the government. Before diving into the bulk of the arguments, I want to make sure I respond to two points you heard repeatedly from my friend on the other side this morning. First, the idea that we've argued in the past for some sort of separate corruption requirement. And, second, the dichotomy between what he's called the civil and the criminal statutes. So on the corruption point first, it's just not right that we have previously characterized the AKS as suggesting there's some separate corruption requirement. The point of the AKS is that when remuneration is offered or given with the purpose of inducing medical decisions, that creates a financial conflict that inherently corrupts the integrity of medical decision-making and federal health care programs. The financial conflict is itself the corruption, and this is a case in point. So, for example, if Vertex would offer $70,000 worth of fertility services to patients in an effort to get them to use Vertex's product, Test Jevy, as opposed to one of the competing products, as opposed to a different treatment, stem cell transplantation, nobody is remotely suggesting that patients who do not need one of these arduous treatments for one of the terrible diseases in question is going to go through the treatment just to get the fertility benefits. Nobody is suggesting that, but the problem is when patients are choosing among treatments or between a cell and gene therapy and a stem cell transplant therapy, this $70,000 benefit creates a financial conflict of interest that may lead them not to make the choice that would otherwise be deemed by them and their doctors to be in their best interest. That is the corruption that the AKS exists to prevent. Second, on this civil and criminal point, you've repeatedly heard the BIS described as the civil counterpart to the AKS. It just is not correct. If you open the statutory addendum that accompanied Vertex's brief to page 29, you will see, beginning on that page, the entire civil monetary penalties law, 1320A, 7A. That goes on for pages, and if you go to page 31, you'll see two distinct paragraphs. One, subparagraph A5, that's the BIS. The second, subparagraph A7, allows HHS to impose monetary penalties for anybody who commits an AKS violation. So that one, B7, that's the civil counterpart to the AKS, not the BIS. The BIS is a distinct provision. It serves a related function, but it is not true. It is categorically not true that something that is accepted from BIS liability by the promotes access to care exception is accepted from all civil liability for AKS violations. The principal basis of civil monetary penalties for AKS violations is in subparagraph 7. That's the one that says you get a civil monetary penalty for conduct that violates the AKS. So this whole business of there's an absurdity because it's, you know, civilly protected but not criminally protected, that's just not right. Mr. Winnick, can I ask you maybe a related question to that point, which is, if HHS were to find that a certain program fit within the promotes access to care exemption, are there cases in which that exemption would apply, but the government would go after some company for criminal violations of the anti-kickback statute? So I don't know. I understand that they're not direct parallel. Right. But there is, you know, if the government were to conclude that it was within the exemption, wouldn't that have some consequence for how they exercise their prosecutorial discretion under the kickback statute? I'm sure it would, both in terms of criminal prosecutorial discretion and in terms of the discretion that HHS OIG exercises at the sort of second step of the advisory opinion decision making process. So the first step is, do we think this would constitute remuneration to induce within the meaning of the AKS? The second step is, even if we think it does, do we think the risks here are sufficiently low that we're going to exercise discretion to say we'll forbear enforcement, you know, we'll make you that guarantee, we'll issue a positive advisory opinion. I'm sure it would influence that. But as a legal matter, the promotes access to care exception does not apply to the AKS. It does not apply to civil monetary penalties for AKS violations under subsection under under paragraph seven of the civil monetary penalties law. It applies only to the BIS. I'm happy to dive with that into sort of the principle. Can I ask about the arbitrary and capricious challenge to the advisory letter? Yes. The advisory letter in footnote 13 cites this 2002 special advisory bulletin, and it says categorical financial need is not a sufficient basis for permitting valuable gifts. And I can see how if that's true, your advisory letter here kind of flows from that and maybe makes sense. But I guess I am not sure I understand. I mean, if if people have a limited amount of money and you make something cheaper. It seems like you're increasing access to that thing. Yeah, I don't I don't think that the advisory opinion is saying anything to the contrary. I think what it is saying and I don't have the bullet in front of me, but I do have the opinion in front of me. I think what it is saying is just that there's no general exception to BIS liability for like offering remuneration to people who are in financial need. I agree that if some program is actually serving the purpose of making it easier for people to get a treatment, an item of service, that would generally speaking increase access to it. The principal point of HHS's reasoning here on the promotes access to care exception was that mitigating a side effect of a drug is not actually the sort of thing you would usually think of as increasing access. So if I if I say, do you have access to Ozempic? What I mean is, can you get a doctor to prescribe it? Do you qualify for it? Can you get it from a pharmacy? Will your insurance cover it or can you pay for it? I don't mean like is there some is there some side effect of it that might cause you to choose not to use it? I'm not sure why, because let's let's take that example. It seems like a person deciding whether to purchase that drug would weigh all the benefits and would weigh all the costs. Those costs would include everything you just said. They would also include the side effect. And if you take away one of those costs, i.e. the side effect, it seems like you are at least on the margins of increasing access. So I agree that they would certainly take that into consideration in deciding whether to use the drug. But I don't think that's what access means, both in terms of sort of plain usage and in terms of the regulations that define it here. Access refers to the ability of a patient to get an item or service. The relevant reg that has the definition is one thousand three point one ten, subparagraph six. It says improve a beneficiary's ability to obtain items or services. So if you make something more appealing by mitigating a side effect by giving somebody. I mean, let's say that the only pharmacy where a drug exists has like a moat with sharks around it and you're destined to, you know, perish in the moat. If you try to access the drug and then along comes someone and eliminates the moat. Yeah, I think you would have increased access. Right. So why wouldn't we do a side effect as maybe the side effect is fatal? And then if you eliminate that side effects, just just like eliminating the moat, you've you've you've eliminated an obstacle to the care. So you increase access to the care. I've lost your audio for a second. Can you hear me? I can hear you. Can you hear me now? I think Mr. Wittig may have frozen, but it could be on my end. It was it was on my end for a second. I think I'm back. OK, can you still hear me? So the answer is yes. Obviously, eliminating the moat would increase access. I think if there's a drug that you can get, you know, once you're once you pass the moat and it has some unappealing side effect. Well, my follow up is why wouldn't we mean a version of it is why wouldn't we view infertility as the moat for some people? That's just a cost they're unwilling to bear. It is a cost they're unwilling to bear. But I think I think just like any other side effect of a drug that that, you know, some people can choose to bear and some others might choose not to bear. It isn't an issue of access. But I don't want to get too hung up on this point because I think really the failing point about the BIS and about this arbitrary and capricious issue is the one Judge Rao asked earlier. I'm not going to fight you hard on if you want to vacate the judgment in our favor in part and send this back to the district court to remand to the agency for it to better explain its application of the promotes access to care exception. The more important point is that would have absolutely no effect on the bulk of the reasoning and advisory opinion. It has absolutely nothing to do with HHS's judgment as to whether this violates. You wouldn't have to reach that, right? Well, I think I suppose you wouldn't have to reach it in the sense that Vertex doesn't get what it wants unless they have a favorable advisory opinion in hand. And so I suppose even if you said, well, the whole thing sort of goes back to the agency, the agency can look at the whole thing that that sort of doesn't get them the relief. I mean, Mr. Winnick, you said earlier that if the agency were to reach a different results on the promotes access to care exception, that they might then need to revisit whether they would excuse this type of program. But even if it fits within the AKS, there might be a reason to, you know, withhold prosecution. I think the prosecution. Yeah. I mean, the point I would make about this opinion is they thought about all of these issues in deciding whether to exercise their discretion the first time. Well, they didn't know because they didn't they didn't decide the promotes access to care exception. They said we don't have enough data. So if we think that's unreasonable and if they concluded that the exception applied, then there might have to be a different decision on the kickback statute. I mean, you said that at the start of your argument. Well, let me be clear. They might reconsider that. They are always free to reconsider. Vertex could go back to them tomorrow and they could reconsider whether to exercise their discretion to forbear enforcement in the future. That's a heckler versus Cheney classic non-reviewable. But you said that the promotes access to care reasoning, you know, is connected to the forbearance of. The sort of reasoning. Yeah. The sort of reasoning that would leave the agency with the government to think that the promotes access to the care exception applies is the same sort of consideration that they might consider in deciding whether to forbear enforcement. But the point the key point I need to make, though, is it doesn't have anything to do with the legal issue that is really the heart of this appeal, which is what does the phrase remuneration to induce in the anti kickback statute mean? And so I think that is that is the issue of greatest forward looking significance to the government for Texas. Arguments on that point would really decimate the AKS. They would render it essentially useless. And so if the court thinks that the promotes access to care analysis is is insufficiently explained, it could send the case back to the agency for the limited purpose of reevaluating that. And if the agency in its discretion, you know, once you wouldn't have to say for the limited purposes. I mean, at least as a formal matter, they've raised an APA challenge. The remedy is to set aside the agency action. We could provide the remedy they seek by setting it aside without opining on anything other than what required it to be set aside. Correct. I think that's probably right. This isn't a rule where you look at like severability for set aside the agency decision only part. But my point is that it doesn't get them to where they ultimately want to go. I mean, the reason they are here arguing that they think it is unlawful for OIG to say that the thing they are thinking of doing violently and a kickback statute because it provides remuneration for the purpose of inducing medical decisions. And that's categorically wrong. And if it were true, it would decimate the AKS. It would leave it essentially a husk of itself. So to turn to that point, which is. Can you talk about the relationship between that argument and the False Claims Act? Right. I mean, the False Claims Act inducement has to have, you know, is interpreted differently from how you understand induced in this statute. But there is. But the anti-kickback statute. Sort of gives rise to False Claims Act lawsuits and liability. So. So how do we understand how those things fit together? Sure. Let me try. So first, I want to make clear that the word induced in this statute is not talking about causation. It's talking about purpose or motive. So the phrase the statute uses is gives or offers remuneration to induce. And what that means is with the purpose of inducing. The False Claims Act, and this is this is complicated because there are a couple of ways in which an anti-kickback statute violation can render false a subsequent claim of seeking reimbursement for the government. One of them, there's a there's a federal statute that says a claim that includes items or services resulting from an anti-kickback statute violation is false. That was the provision that was disputed in the First Circuit case that my friend has mentioned. The government can also prove falsity where somebody falsely certifies compliance with the anti-kickback statute. So there's various causation issues that arise in the FCA context that are that are complicated and I think not the one before this court. But in this statute, induced doesn't mean causation. It means motive or purpose. And so I'm happy to start there with whether the fertility treatments here would be given to induce choices by patients. Vertex relies essentially wholly on Hansen. But the Fourth Circuit correctly explained in its very recent decision in Pharmaceutical Coalition why Hansen is completely inapposite here. And the basic reason is that the statute in Hansen forbade the inducement of criminal conduct. In that case, unlawful entry into the United States. There's a lot of statutes that do that. 18 U.S.C. 2, for example, says whoever induces the commission of an offense against the United States is punishable as the principle, you know, just like aiding and abetting. But the conduct that the AKS forbids trying to induce is not unlawful conduct. The conduct the AKS forbids trying to induce is medical decisions, right? The purchase or provision of medical care, referrals. Those are generally speaking, not unlawful. And so if you construe the AKS as violated only by offering or paying money for the purpose of soliciting or facilitating an unlawful act, which is what Vertex urges you to do. That's the language from page 27 of their brief. It would never be violated. There's essentially no circumstance in which somebody is going to be offering or giving remuneration for the purpose of soliciting or facilitating an unlawful act. Medical decisions are, generally speaking, lawful. Indeed, it's worse than that because the prior version of the AKS didn't use the remuneration to induce language. And everybody agrees that when Congress amended that statute in 1977, it was trying to broaden the statute. And so Vertex's argument would have you believe that when Congress acted in 1977 using language clearly meant to broaden the statute, it actually took a functional statute and rendered it useless. And in this point, you heard from Mr. Hallward-Dremeier this morning that actually none of that is right because there's this parallel provision of the AKS. The solicits or receives provision and therefore the thing you're trying to induce is criminal. That's incorrect for two separate reasons. First, the conduct that it is unlawful to try to induce under the gives or offers provision is not the solicitation or receipt of the remuneration. It's not the thing that violates the parallel provision. It's the medical care. That's not unlawful. That's not unlawful under the parallel provision. That's generally not unlawful under any provision. And second, even if you sort of understand their argument generously to be that there must be some violation of the solicitation or receipt provision whenever there's a violation of the gives or offers provision, that's also incorrect because the gives or offers provision is violated by an uncompleted offer, a rejected offer. And so if you offer somebody remuneration to induce a medical decision and they say no, the medical decision is completely lawful. And so this entire response to the core superfluity that their argument would create, which is that it would render the gives or offers provision meaningless, is just completely incorrect. It is built on a fundamentally textual understanding of the statute. And even aside from that superfluity problem, the problem of rendering the entire provision useless, the whole scheme of statutory exceptions would be pointless under their understanding. You don't need an exception to cover the bona fide payment of a salary to a doctor in a medical practice if they're correct about what induce means. Induce means only soliciting or facilitating an unlawful act. It's obviously not unlawful for a medical practice to be paying for a doctor to be providing medical services in return for a salary from a medical practice. The second basic reason Hansen is inappropriate, which is closely related to the first, is the one Judge Rausch noted earlier, which is that the anti-takeback statute doesn't forbid inducement as the forbidden act. It forbids giving or offering remuneration. It uses the word induce only in describing the purpose with which it is unlawful to give or offer remuneration. There's lots of other statutes that use the word induce that way. We give a number of examples in our brief. Those would all likewise be rendered completely inoperative if the word induce were read as vertex does. And so we don't – they sort of act as if we're resisting Hansen. We don't resist Hansen's basic point that when you see the word induce in a criminal statute, that is, as Hansen says, a clue, a clue that it might take a specialized criminal on meaning. But that's not the end of the analysis. It wasn't the end of the analysis in Hansen, and it's certainly not the end of the analysis here for all of the reasons. The Fourth Circuit ably explained. On remuneration, I'm happy to answer any further questions the court has about to induce. But on remuneration, again, they don't dispute that $70,000 worth of fertility services is remuneration in the ordinary sense of the word. It's a payment of something going to patients, right? What they argue is that it should be given a meaning other than its ordinary meaning. And they make that argument on the basis of the Nazca tour and Ayusten canons, and I'll try to avoid Latin after that. And it's just completely textually unconvincing. So as to the Nazca tour canon, they say, well, kickbacks, bribes, and rebates are all corrupt, evil things, and therefore remuneration must also be understood in this limited way. But first of all, as one of your honors noted earlier, even if kickbacks and bribes are inherently corrupt, that's not true of a rebate. And second, even if it were, this statute doesn't say kickbacks, bribes, and rebates. It says any remuneration, including any kickback, bribe, or rebate. And as the Fourth Circuit explained, there are three different textual clues there that the meaning of remuneration is broader than the meaning of kickback, bribe, or rebate. There's any, there's including, and there's the parentheses. And this is not— Do you have thoughts on Judge Randolph's question about stamming and mootness? Sure. So I don't, I don't perceive there to be a real difference here in terms of the logic of the doctrines. The district court sort of talked about this in terms of mootness. I think we agree with Vertex. It's probably better thought of as an issue of standing at the time they amended their complaint. So to remind you of the chronology here, they filed their initial complaint. It's essentially like mandamus, you know, issue me the opinion and we challenge the regulations. And then three days later, OIG issues the opinion. They amend their complaint and they say we challenge the opinion and please invalidate the regulations. So you look at standing at the time of the amended complaint, that's black letter law, and there is no, there's nothing either alleged in the amended complaint and certainly nothing established with evidence at summary judgment that establishes a concrete forward-looking harm to them from the understanding of the statute that they— And at the time of their original complaint, they did not ask you, they did not ask the court to vacate their regulations? They did in their original complaint, same as in the amended complaint. They did or did not? They did in the original complaint. Let me just, if we assume for the purpose of this question that they do have standing to challenge the regulations, I mean, how are these regulations consistent with the statute? I mean, HHS has authority to make regulations about these advisory opinions. But then in a section that says specific contents, it says the secretary shall be required to issue to a party requesting an advisory opinion, you know, no later than 60 days after the request is received. It says that. It also says in a neighboring provision that the secretary should specify by regulation the procedure to be followed, including, quote, the interval in which the secretary shall respond. So there is certainly some play there. Well, I mean, the play that they give that discretion, but then in a section that says specific contents, it says give the 60-day deadline. I think the best way to understand the regulations is wholly consistent with the 60-day timeline in the statute, is that if you send the agency a piece of paper with a scrawled crayon drawing and you say I'd like an advisory opinion, please, any rational person receiving that is going to say that's not a request. I haven't received a request for an advisory opinion. And I think in substance what OIG has done here is to say something, we have only received a request for an advisory opinion, thus starting the 60-day clock, when it actually contains the information we need to adjudicate the opinion. And if that weren't the case, there really is no way the statute would operate. Right here, OIG posed questions upon receiving, upon accepting this request for an advisory opinion. Vertex responded three and a half months later, right, the gap from late June to mid-October 2023. And under their interpretation of the statute, OIG would have been compelled to respond with an advisory opinion two months into that time, before OIG had gotten the information it needed. So, you know, maybe as Judge Walker suggested earlier, I suppose they could respond by saying, you've asked for an advisory opinion, right, we don't have what we need, we can't give you a favorable advisory opinion, so, you know, denied. And then they would have to come back and pay the fee again and go through the whole process again. And it is very difficult to see why anybody would be better off in that situation, which I assume is why no pharma company has raised this sort of challenge before. And that is, I think that's why the sort of perfectly sound reading of the statute is the one OIG has adopted, which is- We can take one year to issue an advisory opinion that Congress says has to be issued in 60 days? No, and I'm not going to defend here, and they're not challenging here, because this part of it is certainly moot, the time that OIG took beyond the 60 days, even as told. That's, you know, clearly not within the contemplation of the statute. But what's being challenged here is the regulations that say we told the 60 days when we don't have the information we need, either when we don't have it at the outset or when we've initially accepted the request and then we make a further request for information and it's outstanding, the requesting party hasn't responded. In that circumstance, the agency does not have, it has not received a request that it can functionally act on. And so either you say, as they have, that it's told, and then somebody will get a real advisory opinion at the end of it, or you say, if there's no tolling, they'll just have to issue an opinion that says we don't have enough information here to do anything. And it's unclear- Even if it's told while they're waiting for the applicant to provide more information. I mean, they still should only have a 60-day window, right? As told, right. So once the information comes back- And that doesn't seem to be what OIG is doing. I will acknowledge that in this case- Or what they have not done, at least in this case. I will acknowledge that in this case, I don't know the general statistics, but in this case it certainly took longer than the 60 days, even as told. I'm not defending that as- So are you saying that what they did was inconsistent with the, I know you're basically conceding it's inconsistent with the statute. Are you also conceding it's inconsistent with the regulations? It took longer here than either the statute or the regulations would allow. But any argument based on that is clearly- Vertex is making that argument. They are challenging the regulations themselves based on the idea that they have some forward-looking risk of harm. But they're really- I mean, it's quite clear, I think, under this court's precedence, they have not alleged the sort of concrete, non-speculative future risk that this court and the Supreme Court routinely require for standing, even in their complaint, which is the only thing they said in their opening brief. First of all, complaint is not evidence, which you need at summary judgment. But even that, they just sort of say, we're a farming company. We'll probably have advisory opinion requests in the future. That is exactly the sort of someday intention that, as Justice Glee explained in Lujan, does not establish a concrete, non-speculative future. Why is all this similar to some of our FOIA cases where we say repeat FOIA filers can challenge-and I understand these, you know, there are not as many of these advisory opinions. But I think, I mean, there are only a handful of advisory opinions every year. Vertex is a company that's already sought several of the whatever dozen or 20 advisory opinions that are issued. They say they have, you know, innovative drugs pending FDA approval for which they might use this. I mean, why isn't that sufficient here? I think the comparison to FOIA case law underscores quite clearly why we win here. So cause of action, which is the case they cite in their reply brief. In cause of action, the requester had multiple other FOIA requests pending at the time. I mean, in some sense, so that's the nature of FOIA litigation. There are these organizations that they just send hundreds and thousands of FOIA requests. But, I mean, this is just, it's a different type of, you know, government service, arguably, right? I mean, you know, no pharma company has, well, maybe some do, but, you know, thousands of, you know, drugs for which they are seeking an advisory opinion. That's just not the nature of this type of thing. Let me put it this way, Your Honor. If it were easy and obvious that, like, of course they're going to have future advisory opinion requests, it would not have been difficult to do what this court's case law and the Supreme Court's case law clearly require, which is for them to say, you know, in a complaint and then in a declaration, we generally do two of these a year, right? So I anticipate we'll do two in the next year. Or we have a drug under development that we think we're considering a program like this, and we anticipate submitting a request eight months from now. There is nothing remotely like that, even this morning. Is your argument that Vertex, based on the representations that it has made, like, you know, in reply, in its reply brief, and here at oral argument, that it lacks standing or that they have failed to meet their burden of demonstrating standing? Because those are, there is a little bit of a delta between those things. So I would say, if even more clearly the second, they certainly haven't met their burden. Based on the representations this morning and in the reply brief, I'm not wholly sure they could, because I think Mr. Holwood-Riemeyer was careful not to be too specific. And there's just nothing, either in what he said this morning or in the reply brief or in the opening brief or in the complaint, that is anything other than this sort of general, we'll probably do this in the future. And it's exactly the sort of thing that, as the Supreme Court said in Lujan, that sort of someday intention. Absent any concrete specificity, absent even a... Mr. Reich, you might be correct that our FOIA precedents are inconsistent with Lujan. That might be a problem for us for another day. But they are what they are. So why should we treat a pharmaceutical company worse than we treat a FOIA requester? I am not aware of a FOIA precedent that would allow standing based on what you have here. Based on just the fact that you have an organization that routinely makes FOIA requests, and it will probably make them in the future. Again, they've relied on cause of action. In cause of action, you actually had multiple other pending requests at the time. There is no need in that sort of situation to speculate about whether the requesting party is, again, going to be subject to the harm. There's nothing like this sort of we'll probably do it in the future. I'm not aware of a case, FOIA or otherwise, where the court has accepted that sort of theory of standing. Okay. If you're not aware of a case, I can give you one. And that's the KKK case. It's 972 FedSec and 365. It's not a FOIA case, but it's the same question about how much they have to show in terms of repeating the conduct that is now ceased. That's an opinion in our court. Okay. I'm not familiar with it, Your Honor. But, again, I think the general case law, both from this court and the Supreme Court, requires concrete specificity as to forward-looking harm, and there's just nothing like it here. Well, I'm repeating myself, but that's only true when the issue is framed as standing. When the issue is framed as mootness, there are Supreme Court cases that do not require any showing other than what would be in a complaint. So, here, I think the comparison between standing and mootness really, again, just sort of underscores why the waiver text is asking you to think about this is not really the right way to think about it. They sort of say, well, you know, if we don't have standing, then, like, nobody can ever challenge these records because, you know, the case will be brought, and then OIG will issue the opinion. If that is a problem, there is a way to deal with it, which is the capable of repetition, but evading review exception to mootness. You would say, is it clear that the same requesting party is going to be subjected to it again? And is the dispute one that, by its nature, is too short to, you know, that it's not going to get resolved before the particular dispute is terminated? They haven't made any suggestion to that effect here. I think, again, that's clear because they waited months and months after the opinion supposedly became overdue on their interpretation to bring the suit, so there's no genuine problem here. If this dispute persists in the future, the court can resolve it then, but they clearly don't have – there isn't jurisdiction, whether for standing or for mootness reasons, to decide in this context. Okay. Are there any further questions? Judge Randolph? No. Okay. Judge Walker? I'm done. Okay. Thank you. Mr. Hallward, I'll give you two minutes for rebuttal. Thank you, Your Honor. I note that Mr. Winnick did not address the reasoning of Sorenson, Marchetti, or Shana, each of which construed the very language we're discussing here as requiring not mere influence, but wrongful influence. Now, in their brief, they say that's different because that deals with advertising and middlemen, but the statute applies equally to recommending the purchase. That is quintessential advertising, and when faced with those facts and the breadth of the statute, Marchetti and Sorenson, who weren't applying Hansen, agreed that it must be wrongful influence, not mere influence, because otherwise it would outlaw advertising, and that makes no sense. But Hansen provides the answer, and that's what Shana relied on, because Hansen said not simply that it's a clue, but when Congress uses this word that has an established criminal law meaning, it presumably adopts that criminal law meaning. And here, that criminal law meaning is soliciting the crime. Now, here, the crime is the one defined in B-1, which is purchasing the governmentally reimbursed product in return for the money. That is what one is trying to induce. We're trying to induce the purchase of the product in return for it. The money is being offered as the inducement. And so that is why in Sorenson, they specifically say, and this is at 134F4 at page 502, the payment has to be made in order to induce unlawful referrals. And again, that was not even applying Hansen. That's just on the basis of the text of the statute itself and this relationship between B-1 and B-2. Hansen comes in and confirms that that is correct. And that's what the Ninth Circuit analyzed in Shana, that when you stopped the presumption, and the government never here says that they have overcome a presumption. They just want to ignore the presumption. They say Hansen's different because it was soliciting unlawful immigration. But here, it's soliciting the purchase in return for the remuneration. That's the opposite of induce. And so they are on all fours. Okay, I'll give you a few minutes, just now a few minutes, a few seconds just to wrap up. Your Honor, I think that what the government's argument here, including its failure to address how the statute applies to advertising, to the generous and the interplay between the civil statute and the AKS, which the Second Circuit and Hall, Sixth Circuit and Martin have recognized are cousins with the AKS, shows that its reading is overbroad. What the government wants is for parties to come hat in hand, asking for discretion on the government's part, but that's not how we construe criminal statutes in this country. Thank you, Your Honor. Okay, thank you very much. Thank you to both counsel. The case is submitted.
judges: Rao; Walker; Randolph